IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL CASE NO.: |
| | : | 1:13-CR-127-JEC-JSA |
| WILLIAM JAMES WILKINS and | : | |
| MICHAEL ANTHONY FAIRNOT- | : | |
| WOODS | : | |

## ORDER AND REPORT AND RECOMMENDATION

This case began on January 24, 2013, when Dekalb County, Georgia police officers pulled over a car in which Defendants William James Wilkins and Michael Anthony Fairnot-Woods were traveling.  The officers pulled over the car based on alleged traffic infractions, and they also suspected Defendants of drug trafficking. But the evidence obtained as a result of the stop eventually linked Defendants to armed robberies of U.S. Postal Service premises.   Thus, Defendants, along with Co-Defendant Joshua Ellis, were charged with several counts of robbery in interference with interstate commerce in violation of the Hobbs Act, Title 18, U.S.C., Section 1951(a). *See* Indictment [1] at 1.

Defendants Wilkins and Fairnot-Woods allege in their Motions to Suppress Evidence [41][42] and a Motions to Suppress Statements [40][43] that the evidence obtained from the January 24th traffic stop was in violation of their constitutional

rights.[1]  Specifically, the Defendants argue that the traffic stop was not based on probable cause or reasonable suspicion of criminal activity, in violation of their Fourth Amendment rights.  And Defendants argue that they were induced to make incriminating statements involuntarily and/or without proper advisement of rights, in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966).

The Court held an evidentiary hearing as to Defendants Wilkins's and Fairnot-Woods's motions on October 22, 2013 and November 4, 2013 [65] [66], and received post-hearing briefs from the parties [75] [76] [80] [81].[2]  For the reasons stated below, however, the undersigned finds that Defendants' Motions to Suppress [40][41][42][43] are meritless and **RECOMMENDS** that they be **DENIED**.  The Court also **DENIES** Defendant Wilkins's Motion for Production of Name and Location of Confidential Informant [67].

## FACTS

On January 24, 2013, Sergeant Pitts of the DeKalb County, Georgia, Police Department received a tip from a Confidential Informant ("CI") about criminal

---

[1] Defendant Ellis originally filed motions as well, but has since tendered a plea of guilty [71] and his motions have been withdrawn.

[2] These motions have been before the Court since February 25, 2014, as the Court permitted supplemental briefs to be filed by February 24, 2014 [85], and the last brief was in fact filed on that date [89].

activity relating to narcotics in the area of Kelley Chapel Road and Liffey Lane in Decatur. *See* Transcript ("Tr.")[3] at 17-20, 37, 40-43, 49. Pitts worked with the CI for several years and received reliable information on multiple occasions. *See* Tr. at 17-20, 30-31. The CI's information had never been found to be unreliable. Tr. at 19. The CI provided information for pay and was not "working off" any criminal charges. Tr. at 64-65.

The CI reported that two black males with a silver CLK Mercedes were transporting a package or cardboard box, believed to contain marijuana, in the neighborhood of Kelley Chapel Road and Liffey Lane, and the two men had "hit a lick." *Id.* at 18-19, 37, 40-43, 49. Pitts explained this to be a street term meaning a robbery, burglary, or theft of some kind. *Id.* at 24. The CI did not explain his or her basis of knowledge of these facts. *Id.* at 40.

Pitts was in the same vicinity, in plain clothes and driving an unmarked car. *Id.* at 20, 49-50. Pitts drove to the area, arriving within a few minutes of receiving the phone call from the CI. *Id.* at 20, 44-45. Pitts also contacted Detectives Campbell and Forsberg (who were in unmarked vehicles) and Officer George of the DeKalb County Police Department (who was in a marked vehicle) to assist. *Id.*

---

[3] The Transcript is located in two entries on the docket [68] [69], because the hearing was not concluded in one day.  However, because these two documents include a single, consecutive numbering system the Court will refer to the "Transcript" by page number.  All pages numbers through 191 are located on Doc. No. 68 and all page numbers from 192 onwards are located on Doc. No. 69.

at 22.  During the events that culminated in the eventual stop of the Mercedes

several minutes later, these officers communicated with each other on a radio

channel.  *Id.* at 56.

When Pitts pulled into the neighborhood of Kelly Chapel Road and Liffey

Lane, he saw two black men walking down a driveway towards a silver Mercedes,

each carrying a black trash bag over their shoulder. *Id.* at 20-22, 45-46. The trash

bags appeared to contain a rectangular object or objects and were half-filled. *Id.*

20-21, 46.[4]  As Pitts drove by, the men stopped their activity and appeared to watch

Pitts's car go by very carefully all the way up the road. Tr. at 21.  After Pitts pulled

into a driveway and carport up the road, the men appeared to relax and continue

their activity. Tr. at 21-22. There were no other cars in the area. *Id.* at 25. After

placing the trash bags into the passenger compartment of the silver Mercedes, the

two men drove off. *Id.* at 20-22.

Pitts followed the car as it left the neighborhood and made a right onto

Wesley Chapel Road. *Id.* at 22-23.  Pitts observed the car driving fast and

erratically, in that it was weaving in and out of lanes in between other cars three or

four times within a quarter of a mile, without using turn signals. *Id.* at 23, 69, 72.

Campbell was on Wesley Chapel when he first saw the Mercedes, and as it passed

---

[4] Campbell testified that based on his experience with marijuana cases it is typical for marijuana to protrude from a trash bag looking like a rectangular object. Tr. at 103.

he could see two black males in the car and Pitts following. *Id.* at 77. Campbell

observed and reported on the radio that the Mercedes merged onto I-20 and

changed lanes several times without using a blinker. *Id.* at 78. There were other

cars in the vicinity of the Mercedes. *Id.* at 84.

By this time, Officers George and Price were also participating in the

surveillance in his marked vehicle, having also received a call from Pitts regarding

two black males carrying narcotics out of a location near Wesley Chapel Road and

having listened to the other radio communications. *Id.* at 125-126.

Officer George testified that he also saw the Mercedes switch lanes without using

his turn signal, in the middle of medium traffic and with other cars in the vicinity.

*Id.* at 127-128, 158. The officers then pulled over the Mercedes. Tr. at 127.

Price approached the driver's side of the Mercedes and George approached

the passenger's side. *Id.* at 129. George smelled the odor of fresh marijuana, which

he was familiar with from training and law enforcement experience, coming from

inside the Mercedes. *Id.* at 129, 132. George, while on the passenger side of the

car, asked the driver (Defendant Fairnot-Woods) if he had any illegal narcotics or

weapons inside the car. *Id.* at 129. In George's training and experience, when

illegal narcotics are present, weapons are "more than likely" also present. *Id.* at

162. In response, Defendant Michael Fairnot-Woods stated that he did not have

any illegal narcotics inside the car, but the passenger, Defendant Wilkins, stated

that he had a gun beneath his feet where he was sitting. *Id.* at 130. George then directed the Defendants to step out of the car, where they were frisked. *Id.* at 130-131. George then saw the gun inside the car. *Id.* at 131. After Defendant Fairnot-Woods refused consent to search the car, George requested a canine unit. *Id.* at 132. Sergeant Thomas DeVoie of the DeKalb County Police Department arrived shortly thereafter with a drug dog. *Id.* at 134.

DeVoie is a trained and certified canine handler who has worked with a trained and certified drug dog, Ringo, for the past six years. *Id.* at 174-175. Ringo is trained on detecting marijuana, cocaine, heroin, and methamphetamine. *Id.* at 176. DeVoie and Ringo attended Alabama Canine, routinely go through certification with the North American Police Work Dog Association, and receive monthly training. *Id.* at 176, 178-179, Doc. 65, Exs. 2 and 3. When DeVoie arrived he had Ringo do a "free air sniff" of the Mercedes, and Ringo gave a positive alert for narcotics on the driver's side. *Id.* at 182. DeVoie also smelled marijuana when he was walking around the Mercedes. *Id.* at 185. DeVoie put Ringo in the Mercedes and he alerted to the back seat of the car. *Id.* at 184.

After the positive alert for drugs, Fairnot-Woods and Wilkins were handcuffed and placed in separate patrol cars. *Id.* at 137. George then searched the Mercedes, as well as the trash bags in the car, which contained large amount of marijuana and a postal box. *Id.* at 134-135, 148. The postal box was ripped like

trash and thrown inside the trash bag.  *Id.* at 82, 148. George knew that there were armed robberies of postal carriers in the area and after seeing the postal box, thought there might be a connection. *Id.* at 135.

George testified that the marijuana was wrapped in cellophane and was inside the trash bags.  *Id.* at 148-149.  He could not recall whether the marijuana was inside the postal box, but in any event the postal box was ripped open inside the bags.  *Id.*  George stated that "half of it was already cut open but we actually cut the entire bag open."  *Id.*

Campbell advised Defendants of what they were being charged with. *Id.* at 81-82, 114. In response to Campbell telling Wilkins what he was being charged with possession of a gun during a VGCSA, Wilkins stated, "the gun is mine" and, "It's registered to me." *Id.* at 81-82.  Wilkins had not been read his *Miranda* rights at this juncture.  *Id.*

United States Postal Inspector Bryan Musgrove arrived after learning of a possible connection to postal robberies. *Id.* at 197. Musgrove along with United States Postal Inspector Clinton Potter interviewed both Defendants once they were transported back to the local precinct. *Id.* at 200. The inspectors interviewed Wilkins first.  *Id.*  The interview was in a small interview room with no windows. *Id.*  Musgrove and Potter were in business casual attire and not armed during the interview, they provided Wilkins the chance to use the bathroom, and offered food

and drink. *Id.* at 201. Musgrove obtained background information from Wilkins and then advised him of his *Miranda* rights, both orally and in writing, which Defendant acknowledged and waived in writing.  *Id.* 203-206, Doc. 66, Ex 4. Musgrove stated that Defendant appeared to understand his rights, and his responses were lucid and understandable.  *Id.* at 202. The inspectors then left to interview Defendant Fairnot-Woods.  They returned less than an hour later and reminded Defendant of his rights before speaking with him again. *Id.* at 207-209. Defendant never refused to answer the interview questions or ask to speak to an attorney, and the interview was ended by Musgrove and Potter.  *Id.*

Musgrove and Potter also interviewed Defendant Fairnot-Woods. The interview was again in a small interview room with no windows.  *Id.* at 210. Musgrove and Potter were in business casual attire and not armed during the interview, they allowed Defendant to use the bathroom, and offered food and drink. *Id.* at 210-211. Musgrove obtained background information and then advised him of his *Miranda* rights, both orally and in writing, which Defendant acknowledged and waived in writing. *Id.* at 212-216, Ex 5. According to Musgrove, Defendant appeared to understand his rights, and his responses were lucid and understandable.  *Id.* at 211-213. At some point in the interview, Defendant requested a lawyer and all further questioning stopped.  *Id.* at 216.

## DISCUSSION

I.   **REPORT AND RECOMMENDATIONS ON MOTIONS TO SUPPRESS**

    A.   **Lawful Basis For The Traffic Stop**

In order to at least briefly stop a vehicle, an officer must have reasonable and articulable suspicion that the occupants are engaged in criminal activity.  *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Sharpe*, 470 U. S. 675 (1985).  To make a showing that in fact the officers had reasonable suspicion, they "must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity.'"  *Illinois v. Wardlow*, 528 U.S. 119, 123-4 (2000) (quoting *Terry*, 392 U.S. at 27).  However, the "officer's motive in making the traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment[.]'"  *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

Probable cause is not required to justify an investigative stop; reasonable suspicion is sufficient.  *United States v. Powell*, 222 F.3d 913, 917-8 (11th Cir. 2000); *United States v. Mikell*, 102 F.3d 470, 474-5 (11th Cir. 1996).  However, if the scope of a traffic stop exceeds that of an investigative stop, it constitutes an unreasonable seizure unless it is supported by probable cause.  *See United States v. House*, 684 F.3d 1173, 1199 (11th 2012).  In deciding whether there is probable

cause or reasonable suspicion, the Court is to consider the collective knowledge of all law enforcement officers working together, to the extent they maintained at least a minimal level of communication during their investigation. *See United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).

The Government advances two theories for why the officers had reasonable suspicion if not probable cause to justify the stop. First, the Government relies on the alleged traffic violations observed by Officer George and others, particularly relating to the failure to use turn signals. The relevant statute is Ga. Code Ann., § 40-6-123, which provides that:

> (a) No person shall . . . change lanes or move right or left upon a roadway unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving an appropriate and timely signal in the manner provided in this Code section.

> (b) A signal of intention to . . . change lanes when required shall be given continuously for a time sufficient to alert the driver of a vehicle proceeding from the rear in the same direction or a driver of a vehicle approaching from the opposite direction.

Georgia courts have broadly interpreted this statute as requiring drivers to use their turn signal whenever other traffic is nearby. *See, e.g., Salinas–Valdez v. State,* 624 S.E.2d 278, 280 (Ga. App. 2005) (violation committed based on officers' observation that "a car behind them change[d] lanes without signaling and then pull[ed] in front of their patrol car. Traffic was 'medium heavy to heavy' with approximately 20 vehicles nearby traveling in the same direction. In the officer's

opinion, the lane change was unsafe."); *Tukes v. State*, 511 S.E.2d 534, 536 (Ga. App. 1999) (violation committed when vehicle "turned from the slow lane to the middle lane in traffic, [with] vehicles coming up from the rear traveling to his left and then went back into the slow lane without signaling.")

Otherwise, if a turn or lane change can be made with "reasonable safety" absent a signal, no turn signal is required. *See Bowers v. State*, 473 S.E.2d 201, 203 (Ga. App. 1996). For example, in a case where the nearest following car was approximately 100 yards away, and no other evidence was offered as to a particular need to signal, the Georgia Court of Appeals found no objective basis for a violation. *Id.*

Here, several of the officers testified they saw the Defendants' car driving fast, and changing lanes without signaling in and out of traffic. According to Detective Campbell, "it was traveling at a good pace and that it was changing lanes in and out of traffic." Tr. at 79.[5] According to Detective Pitts, the car was "going at a pretty high rate of speed up Wesley Chapel, changing lanes without turn

---

[5] Although Campbell did not effectuate the stop, he was in communication with the other investigating officers, including those who did effectuate the stop. *See* Tr. at 85 ("They were monitoring our channel so that they were aware of where the vehicle was and what traffic violations we were observing."); Tr. at 126 (arresting officer's testimony that "during this time would you have had the ability to listen to radio communications pertaining to the activity that was occurring on this case? A. That's correct.")

signals, weaving in between vehicles. It appeared to be erratic driving, is what I would characterize them." *Id.* at 69. Ultimately, Officer George observed, after Defendants merged onto Interstate 20, that "[t]he driver was in, I believe, the far right lane. He switched lanes into the middle lane without using his left signal." *Id.* at 128. This occurred with "other cars in the area" and in what Officer George described as "medium traffic." *Id.*

The witnesses did not clarify how close the nearest vehicles were in terms of yards or car lengths. But Officer George stated that cars were in the area and that the lane change occurred in "medium traffic." Detectives Pitts and Campbell both characterized the Defendants as weaving in and out of traffic, which suggests close proximity. It is therefore reasonable to infer that the distances between cars was much shorter than in *Bowers*, in which the nearest car was an entire football field away. While the facts could be more precise, the Court finds this evidence to be sufficient to find reasonable suspicion (and probable cause) of a violation of § 40-6-123. This in itself justified the stop.

Second, alternatively, the Government argues that the officers possessed reasonable suspicion that a narcotics crime was underway, which would have independently justified the stop. The officers' information in this regard was based primarily on the tip from the CI, who stated that two black males with a silver CLK

Mercedes had "hit a lick" and were in possession of a package or cardboard box, believed to contain marijuana, in the neighborhood of Kelley Chapel Road and Liffey Lane. *Id.* at 18-19, 37, 40-43, 49.

Statements from confidential or anonymous sources must be considered with care. But they still may provide or contribute to a basis for finding probable cause or reasonable suspicion if, in the totality of the circumstances, the information is sufficiently reliable. In *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir.1996), the Eleventh Circuit set out various factors for courts to consider in reviewing a confidential source's statements: corroboration of the details of the tip through independent police work; whether the informant has made a statement against his penal interests; whether the informant had personal knowledge; whether there is a past history between the informant and the police department that supports his reliability; and whether the police took independent steps to investigate the tip.

Here, several factors weighed in favor of a finding of credibility. Detective Pitts explained that the CI had provided him reliable information for years and had never demonstrated himself to be incredible. That the CI received payment for his tips in this regard actually helps his reliability when considered in combination with this track record. A rational individual would face some deterrence from jeopardizing a lengthy and profitable informant relationship by attempting to sell

bad information.  Pitts also corroborated the tip in certain key respects.  He personally patrolled the area where the CI stated the suspicious activity was taking place; Pitts saw two black men carrying trash bags with apparent box-shaped items within to a silver Mercedes; those men appeared to pay close attention to Pitts and pause their activity while he drove by in his unmarked vehicle; and then the men drove off erratically and at high speed.  These observations supported the information provided by the CI.

On the other hand, the CI did not share and Pitts did not inquire as to the CI's basis of knowledge for the tip.  This weighs against reliability.  But when considered alongside the substantial factors weighing the other way, the Court finds the tip to be sufficiently reliable to establish at least reasonable suspicion when combined with the other facts observed by the officers.  Thus, the Court agrees that the officers had an alternative lawful basis to stop the car, that is, reasonable suspicion of a narcotics crime in process.  *See United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007) (reasonable suspicion established where police received tip that four men were loading weapons into a SUV at a particular location and where police knew armed robberies had occurred in that general area by men driving a SUV); *United States v. Nunez*, 455 F.3d 1223 (11th Cir. 2006) (reasonable suspicion based on fact that defendant was seen entering a house

known to contain a marijuana growing operation, and then left with a garbage bag);
*United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (reasonable suspicion established where defendant was found standing near a parked car, at night, in an area known for drug trafficking and violence, upon seeing approaching officers, quickly moved toward defendant's vehicle).[6]

---

[6] Detective Campbell and Officer George also both testified that they were able to smell raw marijuana as they were following the car on Wesley Chapel Road and/or Interstate 20.  Defendants argue that the Court should reject this testimony as not credible, especially given the uncertain testimony as to whether the Defendants' windows were up or down and that the bricks of marijuana were at least partially wrapped in cellophane inside a plastic bag.  The Court is without sufficient information to make a finding whether the officers could have smelled raw marijuana while driving behind Defendants' car in these circumstances.  But a finding of reasonable suspicion does not require this information; Reasonable suspicion of narcotics-related criminal activity is established based on the testimony of Detective Pitts alone.  Thus, the Court does not consider the alleged smelling-of-raw-marijuana-while-in-pursuit, but nevertheless still finds that the officers had a lawful basis to stop the car.

**B.     The Statements From Defendant Wilkins Should Not Be Suppressed**

Defendant Wilkins requests that his allegedly incriminating statements to Detective Campbell, Officer George and Inspector Musgrove all be suppressed.[7]

It is undisputed that the statements to Campbell and George were made prior to any *Miranda* warnings.  Specifically, when Officer George first approached the car after initiating the traffic stop, he asked whether Defendants had any drugs or guns, and Defendant Wilkins responded that he had a gun at his feet. Tr. at 130. When Detective Campbell informed Defendants of what crimes they were being charged with, Defendant Wilkins again blurted out that the gun was his. Tr. at 81-82.  Defendant argues that these statements should be suppressed as resulting from custodial interrogation without *Miranda* warnings.  He also argues that the

---

[7] Defendant Fairnot-Woods also originally filed a Motion to Suppress Statements [43], but did not include any arguments in support of this Motion in his post-hearing brief [75].  It appears, therefore, that Defendant Fairnot-Woods has abandoned this Motion.  Nevertheless, the Court has *sua sponte* considered the question and has determined that no suppression is warranted as to Defendant Fairnot-Woods's statements.  Unlike Defendant Wilkins, the record includes no evidence of any pre-*Miranda* statements by Defendant Fairnot-Woods.  Before any statements, Inspector Musgrove read Defendant his *Miranda* rights and the Defendant waived those rights orally and in writing.  *Tr.* at 212-216, Ex 5.  The circumstances described by Inspector Musgrove appear to establish that Defendant did so voluntarily.  At some point, Defendant invoked his right to counsel, and according to Musgrove all questioning ceased.  *Id.*  There was no *Miranda* or any Fifth Amendment violation apparent on this record.

subsequent statements to Inspector Musgrove also be suppressed, despite *Miranda* warnings having been furnished at that point, as fruit of the original alleged *Miranda* violations.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his right to remain silent and of his right to the assistance of counsel prior to any interrogation by law enforcement. The Government has the burden to show the knowing and intelligent nature of a *Miranda* waiver. *Id.* at 475.  The Supreme Court instructs courts to look for two things:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).

*Miranda* only applies once a suspect is in custody, that is, once he has been arrested or suffered restrictions on his freedom equivalent to that of a formal arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).  A mere traffic stop does not

generally constitute custody, and therefore questions specifically and narrowly related to the purposes of the investigatory stop and/or to protecting officer safety during the stop are permitted even without *Miranda* warnings. *Id.* Even if *Miranda* were otherwise to apply, the Supreme Court has also indicated that, under a public safety exception, officers may pose limited, pre-warning questions related to the safety of themselves or the public. *See New York v. Quarles*, 467 U.S. 649 (1984); *United States v. Newsome*, 475 F.3d 1221 (11th Cir. 2007) (officer permissibly asked arrested defendant, before *Miranda* warnings, "is there anything or anyone in the room I should know about," to which defendant disclosed the location of a gun).

Under these principles Defendant's statements to Officer George are not suppressible. Officer George approached the car after stopping it and, already smelling the drugs inside, immediately inquired whether any drugs and guns were in the car. This was an officer safety-related inquiry, which is quintessentially permissible as part of the initial contact of an automobile-related *Terry* stop. *See United States v. Jackson*, 280 F.3d 403, 405-406 (4th Cir.2002) (finding that an officer was "fully justified" in inquiring about weapons after making a traffic stop); *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 109-12 (1977) (finding no Fourth Amendment violation where an officer who had made a routine traffic stop asked

the driver to exit the vehicle to reduce the danger to himself); *Michigan v. Long*, 463 U.S. 1032, 1051 (1983) (a protective search of passenger compartment of motor vehicle during a lawful investigatory stop of a vehicle was reasonable). Defendant's response, that he did in fact have a gun, was therefore made during a non-custodial investigative stop and not while in custody. *Miranda* did not apply and the statements is not subject to suppression based on the lack of warnings.

By the time Defendant repeated his statement about the gun to Detective Campbell, Defendant was indisputably in custody. But that statement was not the result of any interrogation by the officers and therefore is not suppressible either. *See Cook v. Warden, Ga Diagnostic Prison*, 677 F.3d 1133, 1140 (11th Cir. 2012) (*Miranda* applies only to statements "stemming from custodial interrogation of the defendant," meaning "questioning initiated by law enforcement officers after a person has been taken into custody") (citations omitted). All Detective Campbell did was inform the Defendants of the charges that would be filed against them. The courts have made clear that informing a suspect of the charges is "normally attendant to arrest and custody" and is therefore not "interrogation." *See Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Enoch v. Gramley*, 70 F.3d 1490, 1500 (7th Cir.1995) ("Briefly reciting to a suspect in custody the basis for holding him, without more, cannot be the functional equivalent of interrogation."); *United States*

*v. Payne*, 954 F.2d 199, 202 (4th Cir.1992) ("the *Innis* definition of interrogation is not so broad as to capture within Miranda's reach all declaratory statements made by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges."); *United States v. Crisco*, 725 F.2d 1228, 1232 (9th Cir.1984) (merely explaining to a suspect why he is being arrested does not constitute interrogation).  Therefore, that Defendant blurted out an admission about the gun in response to simply being told of the charges was not the result of improper interrogation and is not subject to suppression.

As for Defendant's statements to Inspector Musgrove, those were indisputably made in compliance with *Miranda*.[8]  Defendant's only argument is that those statements should be suppressed as fruit of the alleged illegal stop and initial *Miranda* violations.  Because the Court finds no such violations, however, the Court also rejects the basis for suppressing the statements to Inspector Musgrove.

---

[8] Inspector Musgrove warned Defendant of his rights prior to any interrogation, and the Defendant waived those rights both orally and in writing. *See* Tr. at 203-206, Doc. 66, Ex 4.

## II.    ORDER ON DEFENDANT WILKINS'S MOTION FOR PRODUCTION OF CONFIDENTIAL INFORMANT [67]

Generally, the government has a privilege to withhold the identity of law enforcement informants. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). "The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement." *Id.* However, the privilege is limited.

> Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. In these situations the trial court may require disclosure and, if the Government withholds the information, dismiss the action.

*Id.* at 60-61 (footnotes omitted).

The *Roviaro* balancing test takes into account "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). The courts have "focused the inquiry on three factors: the extent of the informant's participation in the criminal activity, the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant, and the government's interest in nondisclosure." *Id.* (quotation marks omitted).  The defendant has the burden to show that a CI's testimony "would significantly aid in establishing an asserted defense," and "[m]ere conjecture about

the possible relevance of [the CI's] testimony is insufficient to compel disclosure."
*Id.* at 1491 (quotation marks omitted).

Defendant Wilkins fails to show a need for disclosure of the CI's identity. Defendant's basis for requesting the information is: "By withholding the identity of the informant until trial, Mr. Wilkins is precluded from mounting a meaningful challenge to the basis upon which he was stopped.   Instead of confronting and cross-examining the informant as to information allegedly provided to Sgt. Pitts, Mr. Wilkins can only confront and cross examine Sgt. Pitts."  Motion [67] at 4.  In other words, Defendant requests the CI's identity only with respect to the issues before the Court on his motion to suppress.  He does not articulate any trial-related issue that requires disclosure of the CI's identity.[9]

The Supreme Court has made clear, however, that a defendant has a

---

[9] Defendant's Motion provided no further case-specific need for disclosure of the information.  However, in his Motion, Defendant suggested that he might offer more if provided the opportunity to make an *ex parte* showing to the Court. *See* Motion [67] at 6-7.  Defendant noted that he "need not reveal his defense to the government in order to make his request for access to an informant."  *Id.*  Thus, Defendant stated that he would be "willing" to make "an in camera showing to the Court as to why Defendant has a need for access to the informant in this case, if necessary."  *Id.*  The Court granted Defendant this opportunity, on February 10, 2014, and granted leave to Defendant to file an *ex parte* sealed submission by February 24, 2014. [85].  No submission from Defendant was received.  The Government filed an *ex parte* submission relating specifically to the law enforcement need justifying nondisclosure.

substantially lesser claim for disclosure "where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake." *McCray v. Illinois*, 386 U.S. 300, 311 (1967).  Rather, the Supreme Court indicated that non-disclosure is permissible in a pretrial suppression hearing "if the trial judge is convinced, by evidence submitted in open court and subject to cross-examination, that the officers did rely in good faith upon credible information supplied by a reliable informant." *Id.* at 305; *see also United States v. Alfonso*, 552 F.2d 605, 618 (5th Cir. 1977) (holding that disclosure of identity of a CI used to secure a wiretap order was not required).  For all of the reasons stated above, the Court concludes that Detective Pitts relied on good faith on what he concluded to be a reliable tip based on his history with the informant and his personal observations at the scene.  Whether or not this information constituted probable cause is judged objectively, based solely on what facts were known to and relied upon by Pitts.

To the extent Defendant wishes production of the CI on the chance that the CI will contradict Pitts's testimony about the tip, such speculation fails under *McCray* and *Roviaro*.  The Supreme Court in *McCray* approvingly quoted language from the New Jersey Supreme Court voicing concern about allowing disclosure for the sole purpose of testing the truth an officer's testimony about the content of a tip:

If a defendant may insist upon disclosure of the informant in order to test the truth of the officer's statement that there is an informant or as to what the informant related or as to the informant's reliability, we can be sure that every defendant will demand disclosure. He has nothing to lose and the prize may be the suppression of damaging evidence if the State cannot afford to reveal its source, as is so often the case. And since there is no way to test the good faith of a defendant who presses the demand, we must assume the routine demand would have to be routinely granted. The result would be that the State could use the informant's information only as a lead and could search only if it could gather adequate evidence of probable cause apart from the informant's data. Perhaps that approach would sharpen investigatorial techniques, but we doubt that there would be enough talent and time to cope with crime upon that basis. Rather we accept the premise that the informer is a vital part of society's defensive arsenal. The basic rule protecting his identity rests upon that belief.

We must remember also that we are not dealing with the trial of the criminal charge itself. There the need for a truthful verdict outweighs society's need for the informer privilege. Here, however, the accused seeks to avoid the truth. The very purpose of a motion to suppress is to escape the inculpatory thrust of evidence in hand, not because its probative force is diluted in the least by the mode of seizure, but rather as a sanction to compel enforcement officers to respect the constitutional security of all of us under the Fourth Amendment. If the motion to suppress is denied, defendant will still be judged upon the untarnished truth.

*McCray*, 386 U.S. at 306-307 (*quoting State v. Burnett*, 42 N.J. 377 (internal citations omitted)).  Here, Defendant identifies absolutely no specific basis to believe that the CI's testimony on this subject will be material and case law does not condone a fishing expedition into CI identities in the hopes that some materiality can be found.  Defendant's Motion [67] is **DENIED**.

## CONCLUSION

For the reasons stated above, the Court **RECOMMENDS** that Defendants'
pending motions to suppress [40][41][42][43] all be **DENIED**.  The Court
**DENIES** Defendant Wilkin's Motion for Production of Confidential Informant
[67].  This case is **READY FOR TRIAL**.


     **IT IS SO ORDERED** this 7th day of March, 2014.


_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE